# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KIM ELAINE GRAVES,                         :

     Plaintiff,                          :    Case No. 3:14cv00067

v.                                         :    Chief Magistrate Judge Sharon L. Ovington
                                                     (By full consent of the parties)

DAYTON GASTROENTEROLOGY,                   :
INC., *et al.*,
                                  :

     Defendants.                         :

                                      :

## DECISION AND ENTRY

## I.    Introduction

Plaintiff Kim Elaine Graves brings this employment discrimination case against her former employer, Dayton Gastroenterology, Inc., and alleged supervisor, David Schum.  Graves claims that Schum sent her sexually harassing text messages and created a hostile work environment.  (Doc. #1, *PageID#* 2).  Graves ultimately resigned from her position at Dayton Gastroenterology and filed a charge of discrimination with the Ohio Civil Rights Commission in May 2013.  (Doc. #1-3, *PageID#* 20).  She received a letter of determination in December 2013 and filed this case in February 2014.

Plaintiff brings claims for hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Ohio Rev. Code § 4112 *et seq.* Her state law claims for intentional infliction of emotional distress, negligent infliction of

emotional distress, and defamation were previously dismissed. (Doc. #10, *PageID##* 105-122).

This case is presently before the Court upon Defendants' Motion for Summary Judgment (Doc. #16), Plaintiff's Response in Opposition (Doc. #20), Defendants' Reply (Doc. #22), and the record as a whole.

## II.  Factual Background

In May 2012, Graves was hired by DG Anesthesia, LLC as a certified registered nurse anesthetist. (Doc. #18, *PageID#* 302). She was hired to manage the anesthesia department at one of DG Anesthesia's facilities: Dayton Gastroenterology in Beavercreek, Ohio. (*Id.*). Graves's role as a manager required her to handle matters involving scheduling; time and attendance; and clinical issues. (Doc. #18, *PageID#* 230). She also acted as a liaison between nursing and anesthesia staff; developed and implemented policy and procedure; and educated staff. (*Id.*). She had authority to make recommendations regarding hiring and termination of employees, but the ultimate decision came from her higher-ups, including Chief Executive Officer Craig Penno. (Doc. #18, *PageID#* 231).

After a few months in her new role, Graves decided she no longer wanted to be a manager. (Doc. #18, *PageID##* 251-52). Instead, she wanted to focus on patient care and was no longer interested in the extra job duties associated with managing the anesthesia department. (*Id.*). Graves simply wanted to "go and do my job and return home and not have to do additional work." (*Id.*). Graves spoke with her supervisor, CEO Craig Penno,

2

about her decision.  Penno accepted her request to transfer to a staff CRNA position, but asked her to stay in her current role a little longer due to departmental needs.  (Doc. #18, *PageID#* 255).  Graves agreed and stayed in her position as manager for about 6 months longer, until approximately January 2013.  (*Id.*)  When she stepped down, another staff CRNA – David Schum – became temporary manager of the anesthesia department.  (Doc. #18, *PageID#* 255).

Graves was already familiar with Schum.  She met him on the first day of her employment at Dayton Gastroenterology and considered him a friend at first.  (Doc. #18, *PageID#* 261).  During her friendship with Schum, she discussed aspects of her personal life, such as where she lived, her professional history, and her spouse.  Graves indicated her conversations with Schum included "[n]othing I wouldn't talk with any other professional about . . . ."  (Doc. #18, *PageID#* 263).

While still a manager, Graves expressed concerns regarding Schum's sobriety to CEO Penno.  (Doc. #18, *PageID#* 238).  She informed Penno that Schum called her cell phone on multiple occasions outside of work with slurred speech and was unintelligible.  (*Id.*).  Graves never spoke directly to Schum about this matter, but spoke to Penno about the issue on multiple occasions and she recommended drug testing him.  (Doc. #18, *PageID##* 238-240).  Penno informed her he would bring her concerns to the attention of the physicians in the group and she was "to do nothing."  (Doc. #18, *PageID#* 244).  Penno later informed Graves that the physicians did not want to do random urine checks of employees.  (Doc. #18, *PageID#* 248).  Graves does not know if Penno ever

3

investigated the matter further or determined the cause of Schum's alleged behavior. (Doc. #18, *PageID##* 245-51).  Nonetheless, it is important to note that Graves testified Schum never had slurred speech or appeared impaired while at the clinic, and "was able to function as a CRNA and provide adequate anesthesia."  (Doc. #18, *PageID#* 251).

Around the time Schum was assigned to be temporary manager, Graves received an inappropriate text message from him.  On Friday, January 25, 2013, Graves sent Schum a text message informing him that she would be back to work from a vacation on Tuesday.  (Doc. #18, *PageID#* 266).  Graves also stated, "I like being on vacation.  I have done nothing all week."  (*Id.*).  In response, Schum sent Graves a text message stating, "I [sic] happy for you, you just have fun and wild sex."  (Doc. #18, *PageID#* 266).  Graves stated she was offended by the text message, but ignored it and did not bring it to her employer's attention until she received a second inappropriate text message from Schum a few days later.  (Doc. #18, *PageID#* 266-67).

The second inappropriate text message Graves received from Schum was sent on February 1, 2013, and read: "You and your husband lay out a wonderful dinner an [sic] have wild sex on the table!!!  I do think about sex all the time.  I [sic] just not getting it." (Doc. #18, *PageID#* 343).  After the second text message, Graves reported the comments to Penno.  (Doc. #18, *PageID#* 271).  Graves believes she reported it the next day.  (*Id.*). She showed Penno the text and told him "it was pretty inappropriate."  (Doc. #18, *PageID#* 271).  Graves indicated that Penno "agreed with [her], was concerned about it, and [stated] he would follow up and investigate it."  (Doc. #18, *PageID#* 271).  Penno

4

indicated he was going to talk with the physicians and that Graves should let him know if Schum does anything else. (Doc. #18, *PageID#* 272).

Graves indicated that Schum started treating her rudely and was angry after she discussed the matter with Penno. (Doc. #18, *PageID#* 272). Schum was "curt" when speaking with her; would not answer questions about assignments or daily function; and would walk away. Schum often wanted to talk about the issue with Graves and told her she should not have gone to Penno to complain. (Doc. #18, *PageID#* 273). Graves told Schum that she would discuss any professional matter with him, but would not discuss the text messages or their friendship. (*Id.*). Graves indicated that Schum continued to act this way. Graves stated that Schum sent her an apology letter, but continued to attempt to discuss the situation with her. (Doc. #18, *PageID#* 276). When she refused, he became angry. (*Id.*). Graves told Penno she could work with Schum professionally. (*Id.*). She used to consider Schum a friend, but no longer did after the second text message she received from him. (Doc. #18, *PageID#* 279).

As a result of her complaining to Penno, Graves believes Schum would not relieve her from her duties at the facility so she could go home in the evening. (Doc. #18, *PageID#* 286). This occurred approximately once per week, from the beginning of February 2013 until she resigned in May 2013. (*Id.*). Graves spoke to Penno about this on multiple occasions, he indicated he would "take care of it," but apparently never did. (Doc. #18, *PageID##* 286-87). Graves also indicated that Schum did not relieve her for lunch on more than five occasions. (Doc. #18, *PageID#* 287). Graves acknowledged that

5

lunch breaks were, in part, dependent upon what was going on in treatment rooms, workload, and staffing, but she believed Schum was deliberately not relieving her because everybody else was given a lunch break.  When Graves asked Schum about it he looked at her and laughed as he walked away.  (Doc. #18, *PageID#* 288).

Graves recalls another instance when Schum was looking at a chart of one of her patients.  Graves came up to the patient's bedside to do a pre-anesthesia assessment, and Schum threw the chart across the bedside table at her.  (Doc. #18, *PageID#* 288).  Graves stated the chart "[w]ent off the bedside table and onto the floor and [Schum] just giggled as he walked away."  (Doc. #18, *PageID#* 289).

Graves also indicated Schum did not notify her of changes to the schedule.  (Doc. #18, *PageID#* 290-91).  She indicated he would hand copies of the updated schedule to other staff members, but not her.  (*Id.*).  Even though the schedule was posted in the anesthesia workroom, Graves stated the changes were not posted immediately and sometimes she did not know what her schedule would be.  (*Id.*).  When she asked Schum about this behavior, he informed her "you did it to yourself.  You went to Craig."  (*Id.*).  Graves indicated that Schum denied a few vacation days off she requested to take.  (*Id.*).  She believes his actions "made it unbearable to work in that facility."  (Doc. #24-1, *PageID#* 410).

Graves resigned from her position at Dayton Gastroenterology on May 30, 2013.  She started a new job as a staff CRNA at a hospital the next month.  (Doc. #18, *PageID#* 305).

6

Graves indicated the matter caused her physical illness, including nausea, anxiety, and headaches. (Doc. #18, *PageID#* 179). The symptoms were intermittent, and ended on the last day of her employment at Dayton Gastroenterology. (Doc. #18, *PageID#* 179). She never missed work because of it and never sought professional treatment. She indicated she treated herself with over-the-counter medications. (*Id.*).

## III. Summary Judgment Standard

The central issue presented by a Motion for Summary Judgment is a threshold issue – whether the case presents a proper jury question. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A party is entitled to summary judgment if there is no genuine dispute over any material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011).

"The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden at trial." *Guarino v. Brookfield Tp. Trustees,* 980 F.2d 399, 403 (6th Cir. 1992); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). If the movant makes this showing, the non-moving party may not rely on the bare allegations of the Complaint but must present affirmative evidence in support of his or her claims. *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992); *Street*, 886 F.2d at 1479-80.

To resolve whether a genuine issue of material fact exists, the Court draws all reasonable inferences in the light most favorable to the non-moving party. *Richland Bookmart, Inc. v. Knox County, Tenn.*,  555 F.3d 512, 520 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).  With these reasonable inferences in the forefront, "[t]he central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Jones v. Potter*, 488 F.3d 397, 402-03 (6th Cir. 2007) (quoting, in part, *Anderson*, 477 U.S. at 251-52 and citing *Matsushita Elec.*, 475 U.S. at 587).

## IV.    <u>Analysis</u>

Graves asserts claims for hostile work environment based on sex in violation of Title VII and the Ohio Civil Rights Act.  As sexual harassment claims under Ohio Revised Code § 4112 are generally governed by the same standards as sexual harassment claims under Title VII, all references to federal law throughout this opinion are also applicable to Graves's claims under Ohio state law

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "A violation of Title VII is established if 'discrimination based on sex has created a hostile or abusive work environment.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (quoting *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir.

8

2000)).

Under the hostile work environment theory, a "workplace [that] is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" violates Title VII. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)(citations and internal quotation marks omitted).

To establish a hostile work environment claim, a plaintiff must demonstrate: "(1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Valentine-Johnson v. Roche*, 386 F.3d 800, 814 (6th Cir. 2004) (citation, internal quotation marks, and alteration omitted).

### 1.     The Harassment

Defendants Dayton Gastroenterology and David Schum contend Graves has not established the third element of her prima facie case for her hostile work environment claim because Schum's behavior was not motivated by the fact Graves is female and therefore was not based upon sex.  (Doc. #16, *PageID#* 144).

Although much of Graves's memorandum in opposition relating to whether Schum's behavior was based upon sex cites to case law addressing employer liability, *see* Doc. #20, *PageID## 378-79* (citing, in part, *Vance v. Ball State Univ.*, 133 S. Ct. 2434,

2439, 186 L. Ed. 2d 565 (2013)), such an issue only arises after Graves shows an actionable hostile work environment by establishing the first four elements of the prima facie case.

To establish that the harassment was "based on her sex," Graves must show that "but for the fact of her sex, she would not have been the object of harassment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

Schum sent two sexually-natured text messages to Graves. The first text message – sent on January 25, 2013 – stated, in relevant part, "you just have fun and wild sex." (Doc. #18, *PageID#* 266). The second message – sent on February 1, 2013 – stated, "You and your husband lay out a wonderful dinner an [sic] have wild sex on the table!!! I do think about sex all the time. I [sic] just not getting it." Both messages, while sexually-natured and inappropriate, were gender-neutral and did not evince an anti-female animus. Although unprofessional, Schum's comments did not contain gender-specific epithets nor were they explicitly sexual or patently degrading of women. *Cf. Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009) (finding triable issue of fact existed as to whether harassment was "based on sex" when names such as "'heifer' with 'milking udders,'" "whores," "sluts," "dykes," and "cunts," were used in the workplace); *Prater v. Lucky You, Inc.*, 2:13cv549, 2014 U.S. Dist. LEXIS 170171, *14 (S.D. Ohio December 9, 2014) (finding material issue of fact as to whether comments made to plaintiff by her co-worker such as "[f]uck you, bitch, suck my dick," "[y]ou're nothing

10

but a prostitute," and "how much do you charge out in the parking lot[?]," were "based on sex.").

Graves testified during her deposition that she found the comments "offensive both personally and from a religious standpoint." (Doc. #18, *PageID#* 299). Graves explained, "[a]s a Catholic, I do not believe that I should be having anybody discussing sexual language, anything with me except my spouse. From a personal standpoint, I feel the same way and it's totally unprofessional to be doing this." (Doc. #24-1, *PageID#* 410). To be actionable, however, "harassment must constitute more than words that have sexual content or connotations." *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 459 (6th Cir. 2004) (citing *Oncale v. Sundower Offshore Servs.*, 523 U.S. 75, 80, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998)). "[D]iscriminatory intimidation, ridicule or insult," must permeate the workplace in order to be severe or pervasive enough to alter the conditions of employment." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).

Graves also claims that after she reported the text messages to Penno, Schum started to treat her rudely and was "curt" with her around the office. (Doc. #18, *PageID#* 272-73). She indicated he would not answer her questions, would not relieve her from her shift in the evening when she was responsible for the last patient room, and failed to give her a lunch break on more than five occasions from February 2013 until May 2013. (Doc. #18, *PageID##* 286-88). Graves indicated that on one occasion he threw a patient's chart across a bedside table at her, the chart fell onto the floor, and he "giggled as he

11

walked away." (Doc. #18, *PageID#* 289).  Graves also claimed Schum did not give her

updated schedules, but provided them to other CRNAs.  (Doc. #18, *PageID#* 290).

Although conduct need not be overtly sexual in nature to support a claim for sexual

harassment, it must still be shown that such "unequal treatment of an employee . . . would

not occur but for the employee's gender . . . ." *Williams v. GMC*, 187 F.3d 553, 565 (6th

Cir. 1999); *see also Mast v. Imco Recycling of Ohio*, 58 Fed. Appx. 116, 118 (6th Cir.

2003) ("The requirement that harassment be 'because of sex' does not mandate that the

harassment be sexual in nature.")(citing *Bowman v. Shawnee State Univ.,* 220 F.3d 456,

463 (6th Cir. 2000); *Williams*, 187 F.3d at 565; *Carter v. Chrysler Corp.*, 173 F.3d 693,

701 (8th Cir. 1999)).  Graves did not indicate that Schum treated male CRNAs any

differently than her or other female CRNAs, rather, she only indicated that Schum was

rude to her and treated her unprofessionally after she complained to Penno about the text

message.  Although Schum's two text messages referenced sex, he never asked for sexual

favors from Graves or called her any derogatory names. *Cf. Williams*, 187 F.3d at 565-66

("The myriad instances in which [plaintiff] was ostracized, when others were not,

combined with the gender-specific epithets used, such as "slut" and "fucking women,"

create an inference, sufficient to survive summary judgment, that her gender was the

motivating impulse for her co-workers' behavior.").  Even Graves agreed that such

comments were inappropriate and unprofessional regardless of whether received by a man

or another woman.  (Doc. #18, *PageID#* 267-68).  For these reasons, Graves cannot

establish the harassment was "based on her sex," as required to establish the third element

of her prima facie case for her hostile work environment claim.

### 2.    Severe or Pervasive

Even if Graves was able to succeed on the third element, she nonetheless fails to satisfy the fourth element of her prima facie case for her hostile work environment claim.

In order to meet the fourth element, "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997)(citing *Harris*, 510 U.S. at 21-22). "[S]evere or pervasive' is properly considered in the disjunctive." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009)). "Whether conduct is severe or pervasive is 'quintessentially a question of fact.'" *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (quoting *O'Shea v. Yellow Tech. Servs. Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)). "The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a mathematically precise test." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (internal quotation marks omitted). Rather, Courts look at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 17.

As to the first sexually-natured text message, Graves testified she was able to ignore it completely. Even after Schum sent the message, Graves still considered him a

friend and continued to communicate with him via text.  Graves even texted Schum three days after the first text message, stating, "You are great and I love working with you and I wanted you to know I understand and feel like you do."  (Doc. #18, *PageID## 355-56).  She texted Schum again on February 1, 2013 at 8:18 PM, and asked him – "as a friend" – whether he could tell her if the organization was planning to terminate her and another employee.  (Doc. #18, *PageID# 359).  Later that evening, at 8:53 PM, Schum sent the second sexually-natured text message.  (Doc. #18, *PageID# 343).

Graves told Penno about the two text messages a few days later.  (Doc. #18, *PageID# 272).  Penno stated he would investigate the matter and talk with the physicians in the practice.  (*Id.*).  Graves indicated that after Penno spoke about the matter with Schum – the very next day, February 6, 2013 – Schum wanted to discuss the issue with her.  (Doc. #18, *PageID# 273).  When Graves would not discuss the matter with Schum, he became angry and treated her rudely.  (*Id.*).  Over the following days, Graves indicated Schum continued to try to discuss the issue and their friendship with her, but she continually refused and he would become angry.  (Doc. #18, *PageID# 276).  Schum would speak in a "loud, rude tone" to her, and he sometimes "walked away abruptly." (Doc. #18, *PageID# 279).  Graves also testified that Schum would not answer questions she asked him; was "curt" when speaking with her; would not relieve her at the normal time from her shift on a few occasions; once threw a patient chart across the bedside table and onto the floor; did not provide her with a lunch break on more than 5 occasions from February 2013 until May 2013; and would not distribute copies of schedule changes to

her despite given them to all the other employees.  (Doc. #18, *PageID##* 279-95).  She

indicated Schum told her, "[y]ou did it to yourself.  You went to Craig [Penno]."  (Doc.

#18, *PageID#* 291).  Graves put in her 60-day notice of resignation on March 30, 2013.

Even after work hours, the former friends bickered through text messaging.  For

example, on May 14, 2013, Schum sent Graves a text message informing her that she was

the late shift the next day.  Graves replied, "Yes schedule has me for late Wednesday and

Friday! What's your point??"  (Doc. #18, *PageID#* 348)(verbatim).  The unprofessional

behavior between the pair continued further that day, in relevant part, as follows:

| | |
|---|---|
| Graves: | My schedule says weds and Friday perhaps you should communicate changes better!!!! I will be available weds and Friday only! |
| Schum: | The same schedule has been up since the last April maybe you need glasses you always try to make yours self the poor victim !!!!!!!!!!!! |
| Graves: | You are being very inappropriate as usual<br>Perhaps we need to discuss your response with Craig in the morning |
| Schum: | Fine<br>He will love to hear you<br>Bring your schedule |

(Doc. #18, *PageID#* 348-350)(verbatim).

While the conduct of Schum that Graves complained about was certainly

inappropriate and unprofessional, a reasonable jury could not find that it was sufficiently

severe or pervasive to create a hostile work environment from an objective viewpoint.

There is no genuine dispute about the key facts.  Aside from the two text messages

Schum sent, there were no other sexually-natured comments or harassing acts.  Schum

never requested sexual favors from Graves nor did he call Graves any gender-specific epithets at work or off-duty. Schum never grabbed, rubbed, or physically contacted Graves. Title VII is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998). Title VII does not provide a cause of action for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)) (citations and internal quotation marks omitted). "[S]imple teasing [and] offhand comments . . . will not amount to discriminatory changes in the terms or conditions of employment." *Id.*

The Court of Appeals for the Sixth Circuit has consistently held that even more serious or persistent conduct is not sufficient to establish this element of a hostile work environment claim. *See, e.g.*, *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)(holding no objectively hostile work environment existed despite comments directed to plaintiff including, "Nothing I like more in the morning than sticky buns," "Say, weren't you [at the biker bar] Saturday night dancing on the tables?" and "[you are] paid great money for a woman;" references to parcels of property as "Hootersville," "Titsville," and "Twin Peaks;" and an employee being told to "Just get the broad to sign it."); *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000) (holding that remarks to plaintiff by her supervisor that he was aroused by the phrase "dick the malls," he told her she "lost her cherry," and he put a pack of cigarettes under her bra strap, were not

16

sufficiently severe to create a hostile work environment); *Rayford v. Illinois Central Railroad*, 489 Fed. Appx. 1, 5-6 (6th Cir. 2012) (finding no reasonable jury could have concluded that sexually inappropriate comments made by supervisor to plaintiff, as well as inappropriate comments made to plaintiff by coworkers such as calling him "sweet booty," telling him the supervisor "wanted to mix coffee with his cream," and the supervisor "got a big dick for [the plaintiff]," rose to the level of a hostile and abusive work environment."); *Stevens v. St. Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 630 (6th Cir. 2013) (finding affectionate text messages and physical contact were inappropriate and unwanted, but did not permeate workplace with discriminatory intimidation or ridicule, nor did they unreasonably interfere with plaintiff's work performance);

In addition, there is no significantly probative evidence that Schum's angry behavior was sexual in nature or occurred due to Graves's sex. *See Eisenbaum v. Senior Lifestyle Corp.*, 560 F. App'x 496, 499 (6th Cir. 2014) (finding that even if plaintiff's coworker exhibited "frosty behavior" toward him after he complained about her comments that he had "nice legs" and a "nice butt," such behavior is not actionable under Title VII as sexual harassment because she was not motivated by plaintiff's gender but "[her] personal displeasure toward plaintiff and the complaints [he] made to [her supervisor].") (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 791 (6th Cir. 2000)).

Likewise, while a single action may result in a hostile work environment if sufficiently severe, none of the conduct Graves describes rises even close to such

17

behavior.  *Cf. Ault v. Oberlin Coll.*, 2015 FED App. 0527N (6th Cir. 2015)(finding genuine issue of material fact existed as to whether defendant-supervisor's behavior toward plaintiff-employee was severe enough to make her work conditions hostile when he stood directly behind her in a walk-in cooler, she could feel his penis against her body, and was trapped in this position despite telling defendant to remove himself).

Assuming Graves subjectively perceived discrimination, a reasonable jury could not find, based on the totality of the circumstances as alleged herein, Schum's behavior was severe or pervasive from an objective point of view.  This is fatal to her remaining claims.  Allowing such deficient claims to otherwise proceed, as the Sixth Circuit aptly noted, would "turn[] a federal jury into a national human resources department, adjudicating workplace disputes so long as a plaintiff subjectively perceives discrimination."  *Craig-Wood v. Time Warner NY Cable LLC*, 549 Fed. Appx. 505, 511 (6th Cir. 2014).  The Sixth Circuit has "long-ago" rejected such claims.  *Id.* (citing *Williams*, 187 F.3d at 564).  So too does this Court.

For these reasons, Defendants' motion for summary judgment is well taken.

**IT IS THEREFORE ORDERED THAT:**

1.   Defendants Dayton Gastroenterology, Inc. and David Schum's Motion for Summary Judgment (Doc. #16) is GRANTED;

2.   Plaintiff's Motion to Strike or in the Alternative Motion in Limine to Prevent Additional Disclosures (Doc. #25) is DENIED as moot; and,

3.   This case is TERMINATED on the docket of this Court.

August 25, 2015

                              s/Sharon L. Ovington
                              Sharon L. Ovington
                              Chief United States Magistrate Judge